EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* MOISÉS HERNÁNDEZ TURELL, acusado y apelante.

Número 15478.

*Sometido:* 2 de noviembre de 1953.  *Resuelto:* 8 de febrero de 1954.

908

*Guillermo S. Pierluisi,* abogado del apelante; *Hon. Secretario de Justicia José Trías Monge* y *Rafael L. Ydrach Yordán, Fiscal Auxiliar del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del tribunal.

El anterior Tribunal de Distrito de Puerto Rico, Sección de Ponce, declaró culpable a Moisés Hernández Turell de una infracción a la sección 10 de la Ley núm. 220 de 15 de mayo de 1948 ((1) pág. 739), según ha sido enmendada, [Ley de Bolita] y lo sentenció a cumplir una pena indeterminada de uno a 5 años de presidio con trabajos forzados. No conforme

con dicha sentencia apeló el acusado para ante este Tribunal y en apoyo de su recurso alega: (1) que la corte sentenciadora cometió error al negarse a suprimir la evidencia ocupada en su casa a virtud de una orden de registro y allanamiento nula; (2) que erró igualmente dicha corte al admitir en evidencia la confesión extrajudicial del acusado y admisiones suyas sin antes haberse probado el cuerpo del delito, y (3) que dicha corte cometió error al estimar probado el delito que se le imputaba al acusado.

El primer error se funda en (1) la alegada existencia de "una variante fundamental entre lo expuesto como causa probable para el allanamiento en el *affidavit* o declaración jurada del policía Francisco Vázquez, placa 765, y lo relatado o expuesto por el Hon. Juez que libró la orden de allanamiento en la orden en sí", y (2) que dicha declaración jurada no suministraba base suficiente para ordenar que el registro se practicara lo mismo durante las horas del día que de la noche.([1]) Estos fundamentos son insuficientes para decretar la nulidad de la orden de allanamiento y del registro practicado. Veamos.

En la declaración jurada que sirvió de base para la expedición de la orden de allanamiento, luego de describirse la casa residencia del acusado apelante, se hace constar lo siguiente:

"Que el querellado se dedica a la manipulación y administración al igual que a la venta de Boli-Pool y Bolita, de boletos, tickets, libretas y papeletas relacionado todo con la Lotería clandestina de Boli-Pool, Bolita en contra versión (sic) con lo dispuesto en la ley núm. 220 aprobada en 15 de mayo de 1948, vigente en Puerto Rico, que declara estorbo público el juego clandestino de Bolita Boli-Pool según lo antes mencionado.

---

([1]) El acusado solicitó oportunamente ante la corte a quo la nulidad de la orden de allanamiento y la supresión de la evidencia ocupada en virtud de la misma, aduciendo además de estos motivos, otros adicionales sobre los cuales no insiste ahora. Después de oír a las partes, la corte a quo declaró sin lugar dicha solicitud.

"Que lo antes expuesto me consta de propio conocimiento porque en algunas ocasiones mientras el declarante se encontraba por el sitio La Barriada Borinquen lugar donde vive el querellado pude observar que individuos saludaban al querellante y hablaban con él sobre este juego clandestino dándole él información plena de los premios, cuánto habían pagado en la Bolita y quién se había pegado en la barriada. Especialmente el día 6 de enero de 1951, el declarante después de haber oído dichas conversaciones del querellado se puso en observación y en esa noche pude verle a él cuando vendía en su casa unos *tickets* de colores y con números a un individuo el cual no conozco y tenía en sus manos varios *tickets* más. Que pude darme cuenta de que este era material de Boli-Pool Bolita porque eran libritos de distintos colores de los expresamente empleados en las bancas de Bolita y Boli-Pool, corroborándose por la conversación que sostenía con el comprador y que el declarante oía entre ellos. Que no pude ocupar esta evidencia, por estar él o sea el acusado dentro de su morada y yo no estaba provisto de una orden legal para tales fines.

"Que el mencionado juego se relaciona con el juego ilegal de Bolita y Boli-Pool clandestino, lo que hacen en combinación con las últimas tres cifras del premio mayor de la Lotería de Puerto Rico o de Santo Domingo, que las bancas pagan de acuerdo a lo estipulado por el banquero y el comprador, siendo los premios los siguientes, primero, segundo y tercero, aproximación y terminal u otra forma que se estipule y cobra el cobrador con la cantidad jugada.

"Por todo lo cual, entiendo que el declarante conoce que este juego es ilícito y contra las disposiciones de la ley núm. 220 antes indicada, amparándome en los preceptos del artículo 503 del Código de Enjuiciamiento Criminal, muy respetuosamente solicito de ese Hon. Tribunal si encuentra causa y cree probable de que en dicha residencia el querellado está violando la ley núm. 220 Ley de Bolita y Boli-Pool vigente, expida la correspondiente Orden de Allanamiento para proceder al registro de dicha residencia el cual (sic) el querellado ocupa allí o en su persona toda evidencia de tickets, boletos, lápices, libretas, papeletas, y número de la Bolita o Boli-Pool y arrestar así a la persona o personas que se dediquen a este juego ilegal, y llevarlos a vuestra presencia para proceder del modo y la forma que la Ley exige."

En lo pertinente, la orden de allanamiento reza así, después de describirse la residencia del acusado:

"Casa que es ocupada por el querellado Moisés Hernández, en dicho sitio el querellado mencionado, tanto de día como de noche, permite y consiente que se impriman o graben, o administra, dirije como dueño, o administrador o apoderado o encargado, o agente director una banca de loterías clandestinas vulgarmente conocidas por Bolita y Bolí-Pool, la cual explota en esta ciudad y barrios limítrofes, manipulando y poniendo en circulación combinaciones relacionadas con los pools de los hipódromos de Puerto Rico, o billetes, tickets o boletos o libretas, o listas numeradas de bolita o boli-pool, sellos de goma y otros enseres e implementos; que dichos boletos o tributos o billetes, o papeletas de pools clandestinos y otros enseres e implementos representan acción, suerte e interés en el juego de loterías clandestinas conocidas por Bolita Boli-pool que para poner en ejecución dichos juegos ilícitos, el querellado utiliza también sellos de goma, bolos numerados, candungos, dinero, papeletas en blanco e impresas y otros enseres e implementos; y hallando esta Corte que hay causa probable de que Moisés Hernández en el sitio y en la forma antes dichos, está utilizando el material y enseres arriba mencionados, a sabiendas e intencionalmente, en violación de la ley núm. 220 del 15 de mayo de 1948, la cual declara los juegos arriba mencionados estorbo público, y castiga la venta, posesión, transportación y conducción, manipulación, etc. de tales materiales, enseres e implementos;

"Se le Ordena Por Tanto, que durante las horas del día y de la noche, proceda inmediatamente al registro [de] la casa de Moisés Hernández, antes descrita, en busca de las prendas siguientes: Boletos de boli-pool, bolita, tickets, combinaciones clandestinas relacionadas con los pools de los hipódromos de Puerto Rico, listas con números representando acciones, suerte e interés, candungos, bolos, dinero y otros enseres e implementos que se estén utilizando para violar las disposiciones de la ley núm. 220 del 15 de mayo de 1948 y si fueren en su totalidad o en parte halladas por usted, las traiga inmediatamente a mi presencia en el Salón de la Corte Municipal de Ponce, Puerto Rico, Sección Segunda."

Convenimos con el apelante en cuanto a que siendo el procedimiento de allanamiento una excepción al derecho del ciu-

dadano a estar garantizado en su hogar contra registros arbitrarios, (²) dicho procedimiento debe seguirse observando estrictamente las disposiciones constitucionales y de ley al efecto. *United States* v. *Rembert*, 284 Fed. 996; *United States* v. *Miller*, 36 F. Supp. 391; *United States* v. *Zager*, 14 F. Supp. 23, confirmado en 84 F.2d 1023, certiorari denegado en 299 U. S. 558.

El artículo 2 de la Ley Orgánica de Puerto Rico, 48 U.S.C.A. sección 737, vigente al momento de ser juzgado el acusado, disponía lo siguiente, en sus cláusulas 12 y 13:

"No se violará el derecho a estar garantizado contra registros y embargos arbitrarios.

"No se expedirá mandamiento de arresto o registro sino por motivo fundado, [el texto inglés dice *probable cause*] apoyado con juramento o afirmación, y describiendo particularmente el lugar que ha de registrarse y las personas que han de ser detenidas o las cosas que deben ser embargadas." (³)

El artículo 530 del Código de Enjuiciamiento Criminal dispone que:

"No se podrá librar orden de allanamiento sino en virtud de causa probable, apoyada en una declaración jurada o citando el

---

(²) Se ha resuelto, asimismo, que ese derecho está relacionado con el privilegio contra la autoincriminación. *Boyd* v. *United States*, 116 U. S. 616, 29 L. ed. 746; *Davis* v. *United States*, 328 U. S. 582, 90 L. ed. 1453, reconsideración denegada en 329 U. S. 824.

(³) Aunque no es de aplicación a este caso, la Constitución del Estado Libre Asociado de Puerto Rico, vigente desde el 25 de julio de 1952, dispone al efecto, lo siguiente:

"Sección 10.—No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.

"No se interceptará la comunicación telefónica.

"Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.

"Evidencia obtenida en violación de esta sección será inadmisible en los tribunales."

nombre o describiendo la persona, y especialmente la prenda sustraída y el sitio que ha de ser reconocido." (⁴)

Este derecho así declarado por la Carta Orgánica y por nuestro Código, *Pueblo* v. *Capriles*, 58 D.P.R. 548, ha sido considerado como parte integrante de la esencia verdadera de las libertades constitucionales. *Gouled* v. *United States*, 255 U. S. 298, 65 L. ed. 647; *Harris* v. *United States*, 151 F.2d 837 (C. A. 10th., 1945.) Se hace imperioso, por lo tanto, el que las cortes examinen minuciosamente dichos procedimientos para asegurarse de que ha habido estricta adherencia a los requisitos constitucionales y estatutarios.

El acusado no cuestiona la suficiencia de la declaración jurada que sirvió de apoyo a la orden de allanamiento en lo que respecta a la existencia de causa probable. Por lo tanto, la orden de allanamiento será suficiente si en ella se exponen los hechos materiales alegados en la declaración jurada, *Heyvert* v. *State*, 194 N. E. 324; 79 C.J.S. 883, sección 79 *b*, o como dice el artículo 507 del Código de Enjuiciamiento Criminal, si en ella se insertan los fundamentos de la petición. Un examen cuidadoso de la orden de allanamiento envuelta en este caso revela que en la misma se exponen los hechos materiales alegados en el affidavit o declaración jurada, que se insertaron en ella los fundamentos de la petición y que la misma cumple con los demás requisitos constitucionales y estatutarios. *Cf. Weinberg* v. *United States*, 126 F.2d 1004 (C. A. 2nd., 1942). Aunque la orden de allanamiento contiene materia adicional añadida por el juez, la misma puede considerarse como superflua (*surplusage*). Cornelius, *Search & Seizure*, 508, sección 210; *Cf. McAmis* v. *State*, 141 P.2d 301; 39 Va. L. R. 114. "La mención en una orden de allanamiento de un estatuto que no viene al caso o *de palabras inne-*

---

(⁴) Por ser ésta una traducción muy pobre del original, copiamos el mismo en inglés:

"A search warrant can not be issued but upon probable cause, supported by affidavit, naming or describing the person, and particularly describing the property and the place to be searched."

*cesarias*, que no afectan los derechos de la persona contra quien se ejecuta la orden, pueden ser rechazados como superfluos." (Bastardillas nuestras.) *Hysler* v. *United States*, 86 F.2d 918 (C. A. 5th., 1936).

El otro fundamento alegado como motivo de este primer error, es frívolo. Aun aceptando, argüendo, que la declaración jurada no supla bases suficientes, como alega, para ordenar el allanamiento "durante las horas del día y de la noche", véanse, sin embargo, *Pueblo* v. *Negrón*, 72 D.P.R. 882 y *Pueblo* v. *de Jesús*, 73 D.P.R. 752, de la prueba surge que la orden se diligenció durante las horas del día y, por lo tanto, el registro y allanamiento es válido. *United States* v. *Lepper*, 288 Fed. 136, confirmado sin opinión en 295 Fed. 1017; *United States* v. *Callahan*, 17 F.2d 937; *United States* v. *Fitzmaurice*, 45 F.2d 133.

El segundo error señalado es frívolo. En el ejercicio de su discreción el tribunal puede variar el orden de la prueba, y sin perjudicar los derechos del acusado, recibir primero en evidencia la confesión del acusado y luego la prueba del *corpus delicti*. *Pueblo* v. *Dones*, 56 D.P.R. 211, 216; 7 Wigmore *On Evidence*, sección 2073, pág. 404; *People* v. *Cowling*, 66 Cal. App. 466, 44 P.2d 441.

Pasamos ahora a considerar el tercer error. La acusación imputa al acusado sustancialmente que "en o por el día 16 de enero de 1951, y en Ponce, Puerto Rico, que forma parte del Distrito Judicial de Puerto Rico, allí y entonces, ilegal, voluntaria, maliciosa y criminalmente, era dueño, director y administrador de varias bancas de los juegos clandestinos conocidos como bolita, y/o boli-pool." La sección 10 de la Ley de Bolita, según fué enmendada por la Ley núm. 264 de 9 de mayo de 1950, pág. 687, de cuya infracción se acusa al apelante, dispone:

"Sección 10.—Todo dueño, apoderado, agente, encargado, director o administrador de los juegos prohibidos por esta Ley será reo de delito *felony*, y será arrestado inmediatamente, dándose traslado del caso sin demora al Fiscal del Distrito con ju-

risdicción, y convicto que fuere dicha persona, será castigada con pena de presidio que no será menor de un (1) año ni mayor de diez (10) años; *Disponiéndose,* que todos los juicios por infracción a la presente sección se celebrarán por tribunal de derecho exclusivamente; Y, *disponiéndose, además,* que toda persona que fuere convicta de una infracción a las disposiciones de esta sección no podrá acogerse a los beneficios de la Ley número 259 aprobada en 3 de abril de 1946, según fué enmendada por la Ley número 177 de 4 de mayo de 1949."

Se arguye ahora que El Pueblo no probó el cuerpo del delito (*corpus delicti*) independiente de las confesiones y admisiones del acusado.

Es doctrina firmemente establecida la de que la confesión del acusado debe ser corroborada mediante prueba *aliunde* que tienda a establecer el *corpus delicti.* 7 Wigmore, ob. cit., sección 2071, pág. 42; Wharton's *Criminal Law,* sección 357, pág. 462; Wharton's *Criminal Evidence,* sección 640, pág. 1072; Monografía en 127 A.L.R. 1130. Véanse además, *Pueblo v. Rosado,* 17 D.P.R. 441; *Pueblo v. Rodríguez,* 28 D.P.R. 501; *Pueblo v. Almodóvar,* 46 D.P.R. 99; *Pueblo v. Méndez,* 41 D.P.R. 275; *Pueblo v. Rivera,* 67 D.P.R. 297; *Pueblo v. Acosta,* 57 D.P.R. 757 y *Pueblo v. Declet,* 65 D.P.R. 23.[5]    Para resolver si en el presente caso existe o no esa prueba debemos determinar primeramente en qué consiste el *corpus delicti* bajo la sección 10 de la Ley de Bolita.

Discutiendo el significado del término *"corpus delicti",* Wigmore se expresa así:

"Está claro que un análisis de todo delito, con referencia a este elemento del mismo [el *corpus delicti*], revela tres partes

---

[5] Esta cuestión ha estado también envuelta en otros casos de este Tribunal aunque de manera incidental. Véanse, por ejemplo, *Pueblo v. Colón,* 39 D.P.R. 904, en el cual después que este Tribunal encontró que se había probado el *corpus delicti* se dijo, a la pág. 906, "que la voluntaria confesión del acusado es prueba suficiente para sostener una sentencia condenatoria." En *Pueblo v. Morales,* 51 D.P.R. 204 y en *Pueblo v. Rosario,* 55 D.P.R. 233, no se levantó el punto aquí en discusión. En el caso de *Pueblo v. Feliciano,* 70 D.P.R. 875, ya se había probado el *corpus delicti* y en el de *Pueblo v. Ramírez,* 52 D.P.R. 489, no había confesión alguna envuelta.

componentes, *primero,* la *ocurrencia* de la clase específica de daño o pérdida (como, en el homicidio, una persona muerta; en el incendio, una casa quemada; en el hurto, propiedad desaparecida) ; *segundo,* el acto criminal de alguien (en contraste, *por ejemplo,* con un accidente) como el origen de la pérdida;—estos dos unidos implicando la comisión de un delito por *alguien;* y *tercero,* la *identidad* del acusado como el autor de este delito." (7 Wigmore *on Evidence,* pág. 401.)

En su sentido ortodoxo el término *corpus delicti* significa que se ha sufrido una pérdida o daño específico como, por ejemplo, en homicidio, que ha habido una persona muerta; en incendio, una casa quemada; en hurto, propiedad desaparecida. Sin embargo, en sus decisiones la mayoría de los jueces han incluído en dicho término el segundo elemento, o sea, que la pérdida o daño ha sido causado por un agente criminal. Un tercer punto de vista, a todas luces absurdo, incluye también el tercer elemento, a saber, la identidad del acusado como el agente criminal. Esto desde luego, significaría que los términos *"corpus delicti"* y *"delito"* son sinónimos. 7 Wigmore, ob. cit., pág. 402.

Este Tribunal no ha aceptado el sentido ortodoxo de dicho término, ni tampoco ha incluído en el mismo el tercer elemento. Por el contrario, desde hace tiempo venimos resolviendo que el *corpus delicti,* está integrado por los primeros dos elementos y por lo tanto, para que el mismo quede probado la prueba debe tender a demostrar: (1) que se ha sufrido una pérdida o daño específico, y (2) que dicha pérdida o daño específico fué ocasionada por un agente criminal. Hemos aceptado la definición dada por la jurisprudencia en el sentido de que "el *corpus delicti* es 'el cuerpo y substancia del crimen', que con relación a delitos determinados significa la comisión real por alguno del delito especial de que se acusa." *Pueblo* v. *Maceira,* 40 D.P.R. 700. Véanse, además, *El Pueblo* v. *Matos y Matos,* 26 D.P.R. 586; *Pueblo* v. *Colón et al.,* 39 D.P.R. 904; *Pueblo* v. *Almodóvar,* 46 D.P.R. 99; *Pueblo* v. *Acosta,* 57 D.P.R. 757; *Pueblo* v. *Declet,* 65 D.P.R. 23; *Pueblo* v. *Rivera,* 67 D.P.R. 297.

Examinemos ahora la prueba de cargo.(⁶) Ésta consistió en los testimonios de los policías Francisco Vázquez y Romualdo García, en el del fiscal de distrito, en la confesión extrajudicial del acusado y cierto material de "Bolita" y/o "Boli-pool".

El policía Vázquez declaró en síntesis, que el día 16 de enero de 1951, en unión al teniente Rodríguez y a los policías Aníbal Correa y Romualdo García, provistos de una orden de allanamiento, registraron la casa residencia del acusado, sita en la Barriada Borinquen de Ponce y allí ocuparon material de boli-pool, consistente en siete mil trescientos veinte quintos de boli-pool de distintas bancas y distintos colores; 15 listas de papel conteniendo números de tres cifras y nombres de personas y una libreta y un lápiz. Contra la objeción y excepción de la defensa, declaró además, que en el momento de ocupar ese material el acusado dijo que era de él, porque el negocio que él tenía era ése, el de boli-pool que él administraba. El resto de su declaración va dirigida a ilustrar cómo se lleva a efecto el juego de "la bolita".

El policía Romualdo García corroboró en lo esencial la declaración de su compañero y las admisiones del acusado fueron admitidas en evidencia nuevamente con la objeción y excepción de la defensa.

El Fiscal Auxiliar, Salvador Veray, declaró en síntesis, que el mismo día del registro, el acusado suscribió ante él voluntariamente una confesión extrajudicial.(⁷) Con la oposición y excepción de la defensa, dicha confesión fué admitida

---

(⁶) El acusado descansó en las cuestiones de derecho que había planteado y no presentó prueba alguna de descargo.

(⁷) En esa confesión el acusado admite que es dueño de todo el material de bolita ocupado por la policía en su residencia; que es dueño de las bancas "Pueblo", "Mi Ayuda" y "Alondra"; que ese "boli-pool" se jugaba en relación con la Lotería de Santo Domingo; que personalmente él administraba y manipulaba esas bancas en su propia casa sin que en ello interviniera ninguna otra persona; que él mandaba a imprimir los tickets y los vendía personalmente; que desde hace cuatro meses se está dedicando a banquero de bolita.

en evidencia. La otra prueba documental presentada por el fiscal consistió en el material de "bolita" ocupado en la residencia del acusado.

Si eliminamos de esta prueba las admisiones y la confesión extrajudicial del acusado, solamente quedaría probado un hecho, a saber, que el acusado tenía en su poder, en su residencia, cierto material, (tickets, libreta, listas de números, boletos) que podían utilizarse o usarse en el juego clandestino denominado "Bolita" y/o "Boli-pool".

Sin embargo, la sección 4 de la Ley impone pena de cárcel por la primera infracción, a toda persona que fuere sorprendida portando o conduciendo o que *tuviere en su poder en cualquier concepto*, determinados materiales e implementos [que se describen en dicha sección] que pudieren usarse para los juegos ilegales de la "Bolita", "Boli-pool", etc., y además impone igual pena a toda persona que poseyere, vendiere, o en cualquier otra forma transportare dichos materiales o cualesquiera otros análogos que se pudieran utilizar o usar en dichos juegos ilícitos, o conectados con la práctica de los mismos. Por su propia naturaleza y por la ilustración hecha por los testigos de cargo respecto a cómo se lleva a efecto el juego de la "Bolita", el material ocupado en la residencia del apelante establece el hecho de que dicho material se utilizaba en el juego de la "bolita" o que estaba conectado con la práctica del mismo y por tanto, que su posesión era ilegal y constituía un delito. Véase, *Romero* v. *People of Puerto Rico*, 182 F.2d 864. De la posesión de esa gran cantidad de material de "bolita"([8]) se infiere lógicamente la existencia de uno de los

---

([8]) El material ocupado en la residencia del acusado se describe como: ". . . . . dos paquetes de boli-pool, boletos, en papel amarillo intenso, mamey; dos paquetes también del mismo material de boli-pool, atados, sostenidos con gomas elásticas, de color amarillo pálido. Los tickets anteriores, los dos primeros, tienen números de tres cifras con una serie de números adicionales más pequeños y las palabras 'Mi Ayuda'. En cuanto a los dos paquetes de color amarillo pálido, aparecen con igual numeración,

juegos prohibidos por la Ley. La "bolita" y el "boli-pool" se juegan por medio de "bancas" independientes que reciben dinero del producto de la venta de boletos o números y que pagan premios en dinero a las personas tenedoras de dichos números agraciados en los sorteos. Véase *Pueblo* v. *Portalatín*, 72 D.P.R. 152. Estas "bancas" sin embargo, son operadas por sus dueños, administradores, apoderados, encargados, agentes, etc., no operan por sí solas. Por lo tanto, probada la existencia de una "banca de bolita" queda establecido el hecho de que alguien es dueño de la misma, o que alguien la administra bien como agente, apoderado, encargado, etc. En vista de estas circunstancias no era necesaria ninguna otra prueba adicional a la presentada en este caso, aparte de las admisiones y confesión del acusado, para dejar establecido el *corpus delicti*. Las admisiones y confesión extrajudicial del apelante, le señalan como "el alguien" que era dueño, director y administrador de un juego de la "bolita" o "boli-pool". El error señalado no fué cometido.

*La sentencia apelada será confirmada.*

El Juez Asociado Sr. Sifre concurre con el resultado.

---

pero con la palabra 'Pueblo'. También aparece un paquete pequeño atado con una goma que dice igual que los números, mejor dicho, los boletos de boli-pool que nombramos, con las mismas denominaciones y con la palabra 'Alondra'. Una serie de listas con números, de quince papeles de forma irregular, tamaño regular, con listas de números de tres cifras, guión en algunos casos, números a la derecha, con palabras escritas en esos papeles, de estraza algunos y papeles blancos y amarillos. Seis hojas de papel, grandes, cubiertas todas las cinco primeras de números de tres cifras y la última con nombres y apellidos y números de tres cifras y con guión y números a la derecha. Y una libreta que dice: 'Roll Book, National, No. 422', con números escritos de tres cifras, a lápiz y nombres de personas en las distintas páginas, y guión después de las tres cifras con números de unidad a la derecha. Esta libreta está escrita en todas sus páginas y tiene su parte exterior de la cubierta y contracubierta color rojo y de cartón, cartón rojo oscuro," (T. de la E., pág. 14.)